# STATE OF NORTH CAROLINA

File No. **07 CVS 34910**

_____Mecklenburg_____ County

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| **Name Of Plaintiff**<br>Sianipar et al.<br>**Address**<br>P.O. Box 26626<br>**City, State, Zip**<br>Raleigh, NC 27611 | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS**<br><br>G.S. 1A-1, Rules 3, 4 |
| **VERSUS** | |
| **Name Of Defendant(s)**<br>GTN Employment Agency, Inc. et. al | **Date Original Summons Issued** |
| | **Date(s) Subsequent Summons(es) Issued** |

## To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Art Bridgman d/b/a Bridgman Vegetable Farms<br>3995 Andrews Chapel Rd<br>Roseboro, NC 28382 | |

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date Issued | Time |
|---|---|---|
| Mary Lee Hall, Lori Elmer, and Katharine Woomer-Deters<br>Legal Aid of North Carolina - Farmworker Unit<br>P.O. Box 26626<br>Raleigh, NC 27611 | 2-22-07 | 10:20 ☒ AM ☐ PM |
| | **Signature**<br><br>☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Date Of Endorsement | Time<br>☐ AM ☐ PM |
|---|---|---|
| | **Signature**<br><br>☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 10/01
© 2001 Administrative Office of the Courts

(Over)

**EXHIBIT A**

**STATE OF NORTH CAROLINA**
**MECKLENBURG COUNTY**

**IN THE GENERAL COURT OF JUSTICE**
**SUPERIOR COURT DIVISION**
CASE NO:

ANDRE AIRLANGGA SIANIPAR,  )
I KOMANG AGUS SURYATA, AND  )
MADE INDRA BUDIAWAN,  )
  )
  )
  )
  )
    PLAINTIFFS  )
  )  **COMPLAINT FOR DAMAGES,**
v.  )  **DECLARATORY, and INJUNCTIVE**
  )  **RELIEF**
GTN EMPLOYMENT AGENCY, INC.,  )
LEETA KANG, SIMON KANG A.K.A. IL  )
KOO KANG, ART BRIDGMAN D/B/A  )
BRIDGMAN VEGETABLE FARMS, MIKE  )
MOORE D/B/A MIKE MOORE FARMS,  )
PT. IRFAN JAYA SAPUTRA, AND PT.  )
MUTIARA BRILLIAN SEJAHTERA,  )
    DEFENDANTS.  )

## I. PRELIMINARY STATEMENT

1.      Plaintiffs are citizens of Indonesia who were recruited by defendants in Bali,

Indonesia, and Jakarta, Indonesia to work as farm workers in North Carolina on H-2A visas.

Under penalty of perjury, Defendants submitted to the U.S. Department of Labor a "clearance

order," which outlined the terms and conditions of plaintiffs' employment and served as

plaintiffs' contract of employment. In that contract, defendants promised the plaintiffs forty (40)

hours a week of farm work, at a rate of eight dollars and fifty-one cents ($8.51) per hour.

Defendants also promised to pay all transportation, visa, and border crossing expenses that

plaintiffs incurred in traveling to the United States. However, before the plaintiffs traveled to

North Carolina to work for defendants, plaintiffs were required to pay recruitment and

1

transportation fees of between fifty-five (55) and sixty-one (61) million Indonesian rupiah (in excess of six thousand U.S. dollars ($6,000.00)), and additional costs to obtain visas. Defendants never reimbursed plaintiffs for those costs as promised in the contract, and as required by law.

2.      When Plaintiff Sianipar arrived in North Carolina, conditions were very different from those promised. He received minimal work, at less than the contract wage, and was housed in substandard conditions. When Plaintiffs Budiawan and Suryata arrived, defendants offered them no work at all, and eventually housed all three plaintiffs in a warehouse-type building with cramped space, no shower, and no stove. Defendants confiscated passports and return airplane tickets from all plaintiffs, told plaintiffs they would have to work illegally if they wanted a job, and threatened them with immigration and financial consequences if they left the employer.

3.      Plaintiffs seek to redress the wrongs they suffered in connection with their North Carolina employment by the defendants, and bring claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et. seq. ("NC WHA"), the North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C. Gen. Stat. §§ 75D-1. et. seq. ("NC RICO"), the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 ("UDTPA"), and the common law claims of breach of contract and misrepresentation.

4.      The plaintiffs seek damages, declaratory relief and injunctive relief, costs of the action and other appropriate relief.

## II. PARTIES

5.      Plaintiffs are natives of Indonesia, and were recruited and/or employed by Defendants GTN Employment Agency, Inc., Leeta Kang, and Simon Kang at all times pertinent to this action, and were promised employment by Defendants Mike Moore d/b/a Mike Moore

Farms and Art Bridgman d/b/a Bridgman Vegetable Farms. Plaintiff Sianipar was also employed by Defendant Bridgman. Plaintiffs were recruited to work in the United States by Defendants Irfan Jaya Saputra and Mutiara Brillian Sejahtera in Indonesia. Plaintiff Sianipar was employed and an employee within the meaning of N.C.G.S. §95-25.2(3) and (4), and was engaged in the production of goods for interstate commerce.

6. Defendant GTN Employment Agency, Inc. ("GTN") acted as a labor brokering business. GTN is a North Carolina corporation located in Mecklenburg County, North Carolina. At all times pertinent to this action, GTN was an employer within the meaning of N.C. Wage and Hour Act, N.C. Gen. Stat. §95-25.2(5), was engaged in the production of goods for interstate commerce, and acted as an employer or in the interests of an employer toward Plaintiff Sianipar. Defendants Leeta Kang and Simon Kang did business as "GTN Employment Agency" at all terms pertinent to this action, and formally incorporated the business on September 7, 2006, amidst the events that form the basis of this complaint. Upon information and belief, GTN was undercapitalized at its incorporation, the corporate formalities were not observed, and it is the alter ego of Defendants Leeta and Simon Kang.

7. Defendant Leeta Kang is a resident of Mecklenburg County, North Carolina. Defendant Leeta Kang was a principal of GTN. Defendant Leeta Kang is a farm labor contractor. At all times pertinent to this action, Defendant Leeta Kang was an employer within the meaning of N.C. Wage and Hour Act, N.C. Gen. Stat. §95-25.2(5), was engaged in the production of goods for interstate commerce, and acted as an employer or in the interests of an employer towards Plaintiff Sianipar. Defendant Leeta Kang engaged in many of the activities alleged in this complaint before she and her husband, Simon Kang, incorporated GTN.

3

8.     Defendant Simon Kang a/k/a Ilkoo Kang is a resident of Mecklenburg County, North Carolina. Defendant Simon Kang was a principal of GTN. Defendant Simon Kang is a farm labor contractor. At all times pertinent to this action, Simon Kang was an employer within the meaning of N.C. Wage and Hour Act, N.C. Gen. Stat. §95-25.2(5), was engaged in the production of goods for interstate commerce, and acted as an employer or in the interests of an employer towards Plaintiff Sianipar. Defendant Simon Kang engaged in many of the activities alleged in this complaint before he and his wife, Defendant Leeta Kang, incorporated GTN.

9.     Defendant Art Bridgman d/b/a Bridgman Vegetable Farms ("Bridgman") lives and farms in Sampson County, North Carolina. At all times pertinent to this action, Defendant Bridgman was engaged in the production of goods for interstate commerce. Defendant Bridgman entered a contract with Defendant GTN in which he promised employment to all plaintiffs and acted as an employer or in the interests of an employer toward Plaintiff Sianipar.

10.     Defendant Mike Moore d/b/a Mike Moore Farms ("Moore") lives and farms in Sampson County, North Carolina. At all times pertinent to this action, Defendant Moore engaged in the production of goods for interstate commerce. Defendant Moore entered a contract with Defendant GTN in which he promised employment to all plaintiffs.

11.     Defendant Mutiara Brillian Sejahtera ("MBS") is labor broker located in Indonesia that recruits Indonesian workers for overseas employment including employment in the United States. Defendant MBS acted as the agent for Defendants GTN, Leeta Kang, Simon Kang, Bridgman and Moore in recruiting plaintiffs for employment, helping plaintiffs to obtain H-2A visas, handling paperwork, and arranging transportation for plaintiffs from Indonesia to the United States, activities which affect interstate or foreign commerce. Defendant MBS collaborated with Defendant Irfan Jaya Saputra in recruiting plaintiffs to work in the United

4

States. Defendant MBS also shared officers with Defendant Irfan Jaya Saputra, including, among others, I Putu Arya Agus Redika.

12.     Defendant Irfan Jaya Saputra ("Irfan Jaya") is a labor broker located in Indonesia that recruits Indonesian workers for overseas employment including employment in the U.S. Defendant Irfan Jaya acted as the agent for Defendants GTN, Leeta Kang, Simon Kang, Bridgman and Moore in recruiting plaintiffs for employment, helping plaintiffs to obtain H-2A visas, handling paperwork, and arranging transportation for plaintiffs from Indonesia to the United States, activities which affect interstate or foreign commerce. Defendant Irfan Jaya collaborated with Defendant MBS in recruiting plaintiffs to work in the United States. Defendant Irfan Jaya also shared officers with Defendant MBS, including, among others, I Putu Arya Agus Redika.

### III. STATEMENT OF FACTS

#### A. Premises of the H-2A Program

13.     A "guestworker" program for seasonal farmworkers exists under current U.S. immigration law. This program is known as the "H-2A" program and is codified at 8 U.S.C. §1181(h)(ii)(a).

14.     Employers seeking to hire H-2A workers must first apply to the U.S. Department of Labor's Employment and Training Administration (ETA) for a certification that 1) there are not enough workers in the United States ready and able to take the jobs, and 2) the conditions offered for the jobs do not adversely affect other farmworkers in the United States. This application is known as an agricultural clearance order. It forms the basis of the job offer.

15.     Under the statute and the regulations promulgated by the Secretary of Labor, employers desiring to employ H-2A workers must provide certain benefits, including an hourly

5

wage set by the Secretary of Labor each year, known as the Adverse Effect Wage Rate (AEWR), reimbursement for transportation costs to and from their permanent home, free housing which meets all applicable federal, state and local housing codes, free transportation to and from the worksite, free work tools, worker's compensation, itemized pay statements, and a minimum of three-quarters (3/4) of the hours of work promised on the job order. All of these items must be included in the clearance order filed with the ETA by the employer.

16. If ETA approves the clearance order and certifies the employer's need for H-2A workers, the employer may file a petition with U.S. Citizenship and Immigration Services ("USCIS") seeking approval for H-2A visas for the prospective employees s/he names in the petition. After the petition is approved, officials of the U.S. Consular Service of the U.S. Department of State schedule those persons for interviews at a U.S. consulate in their home country. If the consular officials find these individuals meet the eligibility requirements for H-2A visas imposed by immigration law (i.e., they are not intending to immigrate to the U.S. permanently, have never been deported, etc.), the workers are issued temporary non-immigrant agricultural (H-2A) visas for the period specified in the ETA certification.

17. Under the law and regulations H-2A visas must be for seasonal agricultural work and are of less than one (1) year in duration.

18. The ETA handbook on H-2A certifications contains specific instructions regarding farm labor contractors who file clearance orders for H-2A workers, noting, "The H-2A program and the implementing regulations are primarily constructed for the use of employers who own and/or operate a fixed-site establishment . . . However, . . . bona fide registered farm labor contractors may be eligible to apply for and receive H-2A certification." ETA Handbook No. 398, II-24 (1988).

6

19. Farm labor contractors have a history of labor violations and economic insolvency. Therefore, the ETA Handbook instructs that state job service and ETA staff should "be careful to look behind any applications filed by farm labor contractors" to ensure that the contractor is operating by the federal statutes regulating farm labor contractors, and that the jobs in the clearance order are genuine and that "the conditions associated with them comply with applicable laws and regulations." ETA Handbook No. 398, II-25 (1988).

20. One way that the ETA implements this instruction is by to require a signed statement from the fixed-situs employer who will use the farm labor contractor verifying the period of employment and number of workers needed. The statement must also detail certain terms of the employment.

21. By the terms of their visas, H-2A workers may be lawfully employed in the U.S. only by the Employer who sought the visa and by none other.

## B. GTN Employment Agency's Efforts to Obtain H-2A Workers

22. In 2005, Defendants Leeta and Simon Kang obtained FLC licenses, under the auspices of an unincorporated business they called GTN Employment Agency ("GTN"), and filed clearance orders as the first step toward obtaining temporary agricultural worker (H-2A) visas for workers from Asia to come to the United States.

23. GTN's office address was the same as that of a digital sign shop they operate on North Graham Street in Charlotte. The only special equipment relevant to farm labor contracting activities that either the Kangs or GTN possessed was a school bus to transport workers, emblazoned with GTN's name.

7

24. The Kangs also used the North Graham Street address for another business they operated, Global Trading Network. In September 2006, the Kangs incorporated the digital sign business, Global Trading Network, and GTN Employment Agency.

25. In 2006, Defendants Leeta and Simon Kang and GTN Employment Agency ("the GTN Defendants") made agreements with a few North Carolina farmers to use the GTN's services to provide H-2A workers to their farms. One of these farmers was Defendant Mike Moore. Another was Defendant Art Bridgman.

26. In June 2006, the GTN Defendants submitted a clearance order, attached as Exhibit 1, to the ETA seeking certification for H-2A workers at Defendant Moore's farm. The Moore clearance order (Exhibit 1) promised the following terms and conditions of employment:

    a.   that work was available for fifty (50) workers;

    b.   that the promised wage was the federal Adverse Effect Wage Rate of $8.51 per hour in conformity with federal law;

    c.   that forty (40) hours of work per week would be provided;

    d.   that the period of employment would be from August 15 to November 15, 2006;

    e.   that employment was guaranteed for a minimum of three-fourths (¾) of the work days of the total specified period during which the work contract was in effect (the "three-quarter guarantee");

    f.   that the work provided would be agricultural work, picking and packing squashes;

    g.   that the housing would be located at 1753, 1748 and 1820 Gilmore St., Fayetteville, North Carolina; and

    h.   that "transportation, visa, and border crossing expenses [incurred by plaintiffs] will be reimbursed on or before the first pay day."

8

27.     As part of the Moore clearance order, Defendant Leeta Kang, on behalf of all the GTN Defendants, also swore under penalty of perjury, to the following assurances:

    a.   that the GTN Defendants had sufficient funds available to pay the wage or salary offered to the H-2A workers; and

    b.   that the GTN Defendants would comply with all federal, state, and local employment-related laws, as required by 20 C.F.R. §655.103(b).

28.     In July 2006, the GTN Defendants submitted a clearance order, attached as Exhibit 2, to the ETA seeking certification for H-2A workers at Defendant Bridgman's farm. The Bridgman clearance order (Exhibit 2) promised the following terms and conditions of employment:

    a.   that work was available for fifteen (15) workers;

    b.   that the promised wage was the federal Adverse Effect Wage Rate of $8.51 per hour in conformity with federal law;

    c.   that forty (40) hours of work per week would be provided;

    d.   that the period of employment would be from August 30, 2006 to January 15, 2007;

    e.   that employment was guaranteed for a minimum of three-fourths (¾) of the work days of the total specified period during which the work contract was in effect (the "three-fourths guarantee");

    f.   that the work provided would be agricultural work, planting, cultivating, harvesting, and packing "oriental vegetables";

    g.   that the housing would be located at 1728 and 1725 Gilmore St., Fayetteville, North Carolina;

9

h. that "transportation, visa, and border crossing expenses [incurred by plaintiffs] will be reimbursed on or before the first pay day."

29. As part of the Bridgman clearance order, Defendant Leeta Kang, on behalf of all the GTN Defendants, also swore under penalty of perjury, to the following assurances:

a. that the GTN Defendants had sufficient funds available to pay the wage or salary offered to the H-2A workers; and

b. that the GTN Defendants would comply with all federal, state, and local employment-related laws, as required by 20 C.F.R. §655.103(b).

30. On June 29, 2006, the GTN Defendants, through Leeta Kang, signed these clearance orders under penalty of perjury pursuant to 28 U.S.C. §1746.

31. The GTN Defendants knew the promises in the clearance order to be false at the time Defendant King signed under penalty of perjury.

32. At the time that Defendant Leeta Kang, on behalf of the GTN Defendants, swore under penalty of perjury to the terms, conditions, and assurances on the clearance order, the GTN Defendants did not intend to comply with the conditions and assurances listed in the H-2A Contracts.

33. Specifically, the GTN Defendants knew that Defendant Moore did not have work for fifty (50) workers on his farm.

34. The GTN defendants also did not plan to house the workers in the housing in Fayetteville which they had identified on the clearance order, for the duration of the dates specified on the clearances order. This is the housing for which they had received certification from the N.C. Department of Labor's Migrant Housing Division, as required by ETA.

10

35. The GTN defendants did not intend to pay plaintiffs the required Adverse Effect Wage Rate.

36. The GTN Defendants did not intend to reimburse plaintiffs for their transportation costs nor for their visa and border crossing expenses as required by the job order.

37. The GTN Defendants did not intend to comply with federal, state and local employment-related laws.

38. The ETA would not have approved the clearance orders without Defendant Leeta Kang's sworn assurances to comply with all federal, state and local labor laws, that the information contained was truthful, and that she had sufficient funds to pay her employees. The ETA would also not have approved the clearance orders if Defendant Kang failed to indicate the authorized migrant housing in which GTN would house the workers.

39. Defendants Moore and Bridgman also signed written contracts ("Grower Agreements") to employ H-2A workers provided by Defendant GTN. Plaintiffs were the intended beneficiaries of these Grower Agreements. These Grower Agreements were submitted with the clearance orders (attached here as Exhibits 1 and 2), and are attached here at Exhibits 3 and 4. ETA required Grower Agreements to be included in the clearance order and would not have approved the clearance orders without Grower Agreements.

40. Defendant Moore's Grower Agreement specified that he needed fifty (50) workers from August 15 to November 15, 2006.

41. Defendant Moore knew when he signed his Grower Agreement that he would not need fifty (50) H-2A workers from August 15 to November 15, 2006.

42. Defendant Bridgman's Grower Agreement specified that his farm needed fifteen (15) workers from August 30, 2006 to January 15, 2007.

11

43. Defendant Bridgman knew when he signed his Grower Agreement that he would not need fifteen (15) H-2A workers from August 30, 2006 to January 15, 2007.

44. Relying on the GTN Defendants' statement of the terms and conditions of employment, the GTN Defendants' sworn assurances, and the enclosed Grower Agreements from Defendants Moore and Bridgman, ETA approved the clearance orders, allowing the GTN Defendants to petition the USCIS for H-2A visas for the laborers of its choice.

## C. Recruitment of the Plaintiffs In Indonesia

45. The GTN Defendants used Defendants MBS and Irfan Jaya as their agents in Indonesia to recruit and hire H-2A workers to work on the certified orders. The GTN Defendants were aware that Defendants MBS and Irfan Jaya would charge applicants a sizeable fee.

46. Defendants MBS and Irfan Jaya held themselves out as the authorized agents of Defendant GTN to the public and to the plaintiffs. Beginning in winter 2006, Defendant Irfan Jaya used the Internet to advertise three-hundred (300) positions for agricultural work in the United States.

47. Defendant MBS sent its principal, Mr. Nunu Juhana, to Charlotte, North Carolina, where he met with the GTN Defendants to conduct business related to his company's recruitment efforts on behalf of GTN.

48. Defendants MBS and Irfan Jaya recruited plaintiffs in Indonesia through newspaper advertisements and personal contacts.

49. Defendants Irfan Jaya and MBS, acting as agents of the other defendants, orally promised plaintiffs that, among other things:

12

      a.   they would work legally in the United States as farmworkers with H-2A visas;

      b.   their employer would provide free housing;

      c.   they could remain working a maximum of three (3) years in the United States.

50. Defendant Simon Kang also went to Indonesia and personally met with the agents and potential workers at the offices of GTN's agents in Java. While there, he assured Plaintiff Sianipar that his first visa would be for six (6) months and that it could be extended for up to three (3) years.

51. Defendants also gave plaintiffs written contracts with Defendant GTN Employment Agency, which were witnessed by agents of Defendant Irfan Jaya. The written contract ("Employment Contract") is attached as Exhibit 5. Defendant Simon Kang signed these contracts on behalf of GTN. The Employment Contract promised, among other things, that:

      a.   The period of employment would be six (6) months;

      b.   The employer would pay the employees between "U.S. $7- U.S. $9 per hour;"

      c.   And that the employment "shall be governed in every respect by the laws of the United State [sic] of America."

52. Defendants MBS and Irfan Jaya informed plaintiffs that their fee would be fifty-five million (55,000,000) Indonesian rupiah (over six thousand U.S. dollars ($6,000)) for the job offered.

53. Defendant MBS gave plaintiffs a contract ("Fee Contract"), which stated that Defendant MBS would "send and give a job to [plaintiffs] in the United States," in exchange for the payment of fifty-five million (55,000,000) Indonesian rupiah from each plaintiff. The Job Placement Contract is attached as Exhibit 6, with attached English translation.

13

54. Defendant MBS showed Plaintiff Sianipar pictures of what purported to be the housing in which he would live. The housing portrayed was of good quality. Defendant MBS told Plaintiff Sianipar that GTN was an established company that had experience with H-2A work visas and showed him pictures of Indonesian recruiter Nunu Juhana taken at the GTN office in Charlotte with the Kangs.

55. Relying upon the promises made to them by Defendants MBS and Irfan Jaya, acting as agents for the other defendants, plaintiffs accepted the jobs offered by Defendants GTN, Bridgman, and Moore, and each plaintiff agreed to pay Defendant MBS or Irfan Jaya fifty five million (55,000,000) rupiah. This amount included the costs of the visa and plaintiffs' transportation from Indonesia to North Carolina, as well as fees for MBS, Irfan Jaya and the GTN Defendants.

### D. Plaintiffs Make Arrangements in Indonesia to Come to the United States

56. Plaintiffs had to make financial arrangements in order to pay the fifty-five million (55,000,000) Indonesia rupiah fee charged by Defendants MBS and Irfan Jaya.

57. The fees represented multiple years of earnings in Indonesia for the Plaintiffs, but the opportunity to earn significantly more in the U.S., and the promise of three (3) years of employment here, induced them to apply.

58. Plaintiff Budiawan sold some personal possessions and borrowed money, using his family's ancestral lands as collateral.

59. Plaintiff Suryata borrowed money from his family.

60. Plaintiff Sianipar sold his possessions and borrowed money to pay the fee of the fifty-five million (55,000,000) Indonesian rupiah. Shortly before leaving Indonesia, agents of

Defendants MBS and/or Irfan Jaya told Plaintiff Sianipar that he would need to pay an additional six million (6,000,000) Indonesian rupiah. Plaintiff Sianipar had to make last-minute financial arrangements to meet this additional demand.

61. Plaintiffs paid the fees to the Indonesian recruiters, Defendants MBS and Irfan Jaya. These fees were primarily for the benefit of the plaintiffs' employers.

62. Upon information and belief, the GTN Defendants intended that a portion of the fees which plaintiffs paid to the agents in Indonesia would be remitted to them in North Carolina.

63. Agents of Defendants MBS and Irfan Jaya told plaintiffs to come to Jakarta in early September 2006 for their visa interview at the U.S. Embassy's consular section.

64. Plaintiff Sianipar is from Jakarta, but plaintiffs Budiawan, and Suryata had to make several trips from their homes in Bali to Jakarta in order to secure the visa. For plaintiffs Budiawan and Suryata, these trips necessitated a flight from Bali to Java and an overnight stay in Jakarta. MBS and Irfan Jaya charged Plaintiffs Budiawan and Suryata additional money for these trips, requiring them to utilize the transportation and accommodations arranged by them. Upon information and belief, the amount Plaintiffs Budiawan and Suryata paid for the transportation and accommodations included an additional charge for Defendants MBS and Irfan Jaya.

65. The expenses incurred on these trips were for the benefit of Defendant Bridgman and the GTN Defendants.

66. Agents of Defendants MBS and Irfan Jaya instructed plaintiffs that, if asked in the visa interviews by consular staff how much they paid for defendants' services to obtain the visa, they should answer no more than one thousand eight hundred dollars ($1,800). At this point, plaintiffs had already paid Defendants MBS and Irfan Jaya a total of thirty-five million

15

(35,000,000) Indonesian rupiah, which was equivalent to more than four thousand dollars ($4,000).

67. Plaintiff Sianipar was approved by the U.S. consulate for an H-2A visa, which he received within a week of his arranged flight to the U.S. Plaintiff Sianipar was surprised to discover that the visa expired on November 15, 2006, but was reassured by agents of Defendants MBS and Irfan Jaya that the visa would be renewed.

68. Plaintiffs Sianipar flew from Jakarta, Indonesia to Los Angeles, California on September 30, 2006. He arrived in North Carolina on or about October 1, 2006.

69. In their first two trips to the U.S. Embassy in Jakarta to obtain their visas, Plaintiffs Budiawan and Suryata were told that Defendant GTN had not submitted the proper paperwork for them to be approved for their visas. Finally, on their third trip to the U.S. Embassy on October 6, 2006, Plaintiffs Budiawan and Suryata were told that the paperwork was in order and the visas would be issued.

70. Plaintiffs Budiawan and Suryata traveled to the United States from Denpasar, Bali, Indonesia by air, arriving in Charlotte, North Carolina on October 18, 2006.

### E. Plaintiffs Sianipar Arrives at Bridgman Farm in North Carolina

71. Defendant Simon Kang met Plaintiff Sianipar at the airport and drove him to the Bridgman farm where six (6) other Indonesian H-2A workers had already arrived. Defendant Simon Kang informed Plaintiff Sianipar during this trip that he would not work picking squash, as the contract said, because Kang claimed that one of the growers (Moore) had no work, and the other farm (Bridgman) only needed six (6) workers.

16

72. Plaintiff Sianipar and the six (6) other workers were housed in a trailer on the Bridgman farm. This trailer was not licensed as a migrant labor camp by the North Carolina Department of Labor nor did it meet the health and safety standards for a migrant labor camp. Defendant Bridgman had an outstanding fine from the North Carolina Department of Labor for housing migrant farm workers in the same trailer earlier that year.

73. The other workers, who had arrived shortly before Plaintiff Sianipar, had already been forced to turn over their passports and return airplane tickets to the Kangs. A few days after Plaintiff Sianipar arrived at the Bridgman farm, Defendant Leeta Kang returned to the trailer and demanded that he relinquish his passport and return airplane ticket. When Plaintiff Sianipar asked why they had to be taken, Defendant Kang informed Plaintiff Sianipar that this was a mandatory condition of the job, and then she took his passport and return airplane ticket.

74. The GTN Defendants and Bridgman failed to provide Plaintiff Sianipar with the work they had promised at the Bridgman farm. Plaintiff Sianipar was paid less than the hourly wage required under the H-2A Contract and the law [eight dollars and fifty-one cents ( $8.51)].

75. Shortly after Plaintiff Sianipar's arrival, the Kangs brought more Indonesian H-2A workers to the farm, swelling the number of men housed in the trailer to fourteen (14). Many workers had to sleep on the floor and there was no functioning heat. The trailer was also infested with cockroaches and the conditions were otherwise substandard.

76. The GTN Defendants also required workers living at the trailer to pay additional, previously undisclosed amounts for utilities and other housing charges.

77. With fourteen (14) workers now at the farm, GTN and Bridgman could offer even less work for each worker.

17

## F.  Plaintiff Sianipar is Moved to GTN's Workshop in Charlotte, North Carolina

78.  On or about October 12, 2006, the GTN Defendants and Defendant Bridgman told Plaintiff Sianipar that he would have to leave the farm and work elsewhere.  He was not offered any choice.  The GTN Defendants sent another worker to work in a Chinese restaurant; Plaintiff Sianipar was brought back to the GTN office in Charlotte.

79.  Plaintiff Sianipar was surprised to discover that the GTN Employment Agency office was, in reality, a shop which manufactured digital signs.  He also discovered that another Indonesian who had come on an H-2A visa was working in the digital sign shop for the GTN Defendants.

80.  Plaintiff Sianipar and the other worker were housed in a small room inside a workshop behind the storefront and office of the Kangs' digital sign shop.  (See photo of entrance to room, attached as Exhibit 7).  The housing was woefully below standards.  Plaintiff Sianipar slept on a small mattress on the floor.  He and the other worker used a toilet in the office bathroom, which did not contain any bathing or shower facilities.  (See Exhibit 8).  The only water available for cooking, washing food utensils, and bathing was an industrial-style janitor's sink in the bathroom, which was stained with paints and chemicals from the graphics business. (See Exhibit 9).  There was no hot water, so Plaintiff Sianipar had to boil water on a hot plate to heat it before bathing.  The cooking facilities consisted of only a refrigerator and a rice cooker. While there was also a microwave, Defendant Leeta Kang instructed Plaintiff Sianipar that he was not allowed to use it.

## G. Plaintiffs Budiawan and Suryata Arrive in Charlotte, North Carolina

81. Defendant Leeta Kang met Plaintiffs Budiawan and Suryata at the airport when they arrived on October 18, 2006 and drove them directly to the GTN office at the digital sign shop.

82. Defendant Leeta Kang informed Plaintiffs Budiawan and Suryata that their contract at the farm was no longer valid, and if they wanted to work in the U.S. they would have to work elsewhere. She told them that she was going to find them work elsewhere because the farmers did not want their labor anymore.

83. Once at the GTN office, Defendant Kang confiscated Plaintiff Budiawan's and Suryata's passports and return airplane tickets.

84. The GTN Defendants housed Plaintiffs Budiawan and Suryata in the same room in the workshop already occupied by Plaintiff Sianipar and the other worker. The three plaintiffs shared the small, twin-sized mattress on the floor to sleep. The plaintiffs bought food and other necessities with the money they had brought with them and with the meager wages which Plaintiff Sianipar had earned on the Bridgman farm.

85. Days went by with no indication to the plaintiffs that the GTN defendants were doing anything to locate work for them.

86. On or about October 26, 2006, after living in the cramped conditions of the workshop and not working or earning any money, plaintiffs told Defendant Leeta Kang that they wanted to return home. Defendant Leeta Kang refused to relinquish their passports, visas and return airplane tickets unless they each paid her the sum of two thousand dollars ($2,000.00). Plaintiffs, of course, did not have the requested amount. They believed that Leeta Kang demanded this amount with the aim of placing them in a restaurant or other job and deducting this amount from their wages over time.

19

87. On October 28, 2006, at about 1:30 p.m., Defendant Leeta Kang told Plaintiff Suryata that she had made arrangements for him to fly to Indonesia at 2:30 p.m., but she would not let him leave unless he signed a paper first promising not to sue her or Defendant GTN. The paper was in English. Upon information and belief, it purported to renounce any claims which plaintiffs might have against the GTN defendants and to state that plaintiffs wished to return to Indonesia because they were refusing to work. Defendant Leeta Kang also asked Plaintiff Budiawan to sign the same document.

88. When Plaintiffs Suryata and Budiawan refused to sign the paper, Defendant Leeta Kang became very angry. Plaintiffs feared that Defendant Leeta Kang would retaliate by calling the U.S. authorities to have them arrested. This fear was heightened by the fact that Defendant Leeta Kang held their passports and visas and they had no identification documents. Plaintiffs left the store quietly by the back door, leaving behind their belongings.

89. Defendant Leeta Kang followed plaintiffs in her car. She ordered them to get into her car, which plaintiffs refused. Defendant Leeta Kang trailed the plaintiffs to the downtown bus station. At the station, Defendant Leeta Kang told plaintiffs she would call immigration if they didn't return to the GTN workshop. Plaintiffs were frightened, but refused.

90. Plaintiffs made several attempts through their counsel to regain their property from Defendant Kang, who finally returned the items to plaintiffs.

91. Defendant Kang has redeemed the airplane tickets of plaintiffs' non-represented co-workers for their cash value.

92. Plaintiffs suffered significant damages due to defendants' false promises and failure to provide promised benefits, including, among other things, the exorbitant fees they paid in recruitment fees, transportation, and visa costs; interest paid on loans in Indonesia; loss of

employment they had in Indonesia; loss of the promised contract benefits in the United States; the taking of the passports with visa and airplane tickets and other incidental damages.

## H.  Facts Related to Racketeering Activity

93.  NC RICO became effective on October 1, 1986 with the purpose and intent to deter organized unlawful activity, including the prevention of unjust enrichment of those engaged in unlawful activity. See N.C.G.S. §75D-1, et. seq.

94.  NC RICO allows any innocent person, who is injured by reason of racketeering activity, to have a cause of action to recover their damages, N.C.G.S. §75D-8(c).

95.  The GTN Defendants derived substantial economic proceeds and profits from the pattern of racketeering activity alleged herein.

96.  The GTN Defendants, in association with Defendants MBS and Irfan Jaya, and in association with participating growers, conducted and organized an unlawful worker exploitation scheme for the purpose of obtaining a pecuniary gain at the expense of plaintiffs.

97.  The GTN Defendants fraudulently applied for and received approval for over thirty (30) H-2A visas, allowing Defendants to charge Plaintiffs and other Indonesian workers exorbitant recruitment fees through misrepresenting the job positions, all for personal profit.

98.  In order to perpetrate this unlawful worker exploitation scheme, the GTN Defendants knowingly and willfully committed multiple acts of racketeering activity under N.C.G.S. §75D-3(c)(1); including N.C.G.S. §14-209 (Perjury); N.C.G.S. §14-72 (Larceny) or, in the alternative N.C.G.S. §14-90 (Embezzlement); and N.C.G.S. §14-118.4 (Extortion).

21

99. In order to perpetrate this unlawful worker exploitation scheme, the GTN Defendants knowingly and willfully committed multiple acts of racketeering activity under N.C.G.S. §75D-3(c)(2); including 18 U.S.C. §1546 (Visa Fraud).

**Visa Fraud – Violation of 18 U.S.C. §1546**

100. The GTN Defendants knowingly and willfully devised a scheme to defraud the ETA, U.S. Citizenship and Immigration Services ("USCIS"), and the U.S. Department of State ("DOS"), by making materially false statements with the intended purpose of depriving plaintiffs and other similarly situated persons seeking H-2A employment of their property and basic labor rights for personal profit.

101. In order to obtain H-2A labor, an employer is required to submit a clearance order as described above in ¶¶14-20 of this Complaint.

102. The GTN Defendants submitted and were approved for H-2A visas based on their sworn assurances as set forth in ¶¶26-30 of this Complaint.

103. The GTN Defendants collectively made false assurances as set forth in ¶¶26-30 of this Complaint in order to have the clearance orders approved so that they could approach their victims with promises of employment in the United States.

104. Without the false assurances, the GTN Defendants would have been unable to obtain H-2A workers and would have been unable to exploit the H-2A workers for personal profit.

105. ETA approved the fraudulent labor certifications submitted by the GTN Defendants in 2006, USCIS approved the I-129 petition, and the DOS issued H-2A visas for employment with the GTN Defendants and contracting growers.

22

106.    During this time, the GTN Defendants collected several thousand dollars each from plaintiffs and other applicants through their overseas recruiters, Defendants MBS and Irfan Jaya, as a direct result of this scheme.

107.    As set forth in ¶¶26-38 of this Complaint, the GTN Defendants knowingly and willfully made, under penalty of perjury, material false statements about the terms and conditions of the job.

108.    As set forth in ¶92 of this Complaint, the GTN Defendants' falsely sworn assurances in their visa application caused plaintiffs' economic injuries.


**Perjury – Violation of N.C.G.S. §14-209**

109.    The GTN Defendants knowingly and willfully devised a scheme to defraud the ETA, USCIS, and the DOS, by making materially false statements with the intended purpose of depriving plaintiffs and other similarly situated persons seeking H-2A employment of their property and basic labor rights for personal profit.

110.    In order to obtain H-2A labor, an employer is required to submit a clearance order as described above in ¶¶14-20 of this Complaint.

111.    The GTN Defendants submitted and were approved for H-2A visas based on their sworn assurances as set forth in ¶¶26-30 of this Complaint.

112.    The GTN Defendants collectively made materially false assurances as set forth in ¶¶26-30 of this Complaint in order to have the clearance orders approved so that they could approach their victims with promises of employment in the United States.

23

113.    Without the false assurances, the GTN Defendants would have been unable to obtain H-2A workers and would have been unable to exploit the H-2A workers for personal profit.

114.    ETA approved the fraudulent labor certifications submitted by the GTN Defendants in 2005 and 2006, and USCIS approved the I-129 petition, and the DOS issued H-2A visas for employment with the GTN Defendants and contracting growers.

115.    During this time, the GTN Defendants collected several thousand dollars each from plaintiffs and other applicants through their overseas recruiters, Defendants MBS and Irfan Jaya, and as a direct and proximate result of this scheme.

116.    As set forth in ¶¶26-38 of this Complaint, the GTN Defendants knowingly and willfully made, under penalty of perjury, material false statements.

117.    As set forth in ¶92 of this Complaint, the GTN Defendants' falsely sworn assurances made under penalty of perjury in the visa application caused the plaintiffs' economic injury.

**Larceny – Violation of N.C.G.S. §14-72**

118.    As set forth in ¶73 and ¶83 above, the GTN Defendants, through Defendant Leeta Kang, wrongfully took plaintiffs' property, including their passports, visas and return airplane tickets without plaintiffs' consent and under duress.

119.    Defendant Kang had taken the tickets with the intent to convert the property to the financial benefit of the GTN Defendants through the attempted extortion described elsewhere in this complaint, or if that failed, through redeeming the cash value of the airplane tickets.

120.    As set forth in ¶¶86-87 above, the GTN Defendants attempted to extort two-thousand dollars ($2000.00) from each of the plaintiffs in return for which the GTN Defendants

24

would return to plaintiffs their passports, visas and return airplane tickets. The GTN also used these items to attempt to obtain immunity from future lawsuits, by having plaintiffs sign a waiver of their right to sue defendants.

121. When the extortion failed, the GTN Defendants kept the passports, visas and the return airplane tickets in their possession and refused to return the items to plaintiffs until plaintiffs' attorneys intervened, whereupon defendants returned the passports, visas and airplane tickets to plaintiffs.

122. As set forth in ¶92 above, the GTN Defendants' larceny caused the plaintiffs' economic injury.

**Embezzlement – Violation of N.C.G.S. §14-90**

123. In the alternative, the GTN Defendants became the bailees of plaintiffs' passports with visas and return airplane tickets.

124. Plaintiffs never consented for the GTN Defendants to use the items for purposes of extortion nor to redeem the cash value of the airplane tickets for the personal benefit of the GTN Defendants.

125. The GTN Defendants received these items knowing that these items were not their own.

126. The GTN Defendants then intentionally embezzled or fraudulently or knowingly and willfully misapplied or converted these items to their own use through using the items to attempt to extort money, then immunity, from the plaintiffs.

127. As set forth in ¶92 above, the GTN Defendants' embezzlement caused plaintiffs to suffer economic injuries.

Case 3:07-cv-00142-CH   Document 1-1   Filed 03/30/07   Page 26 of 36

**Extortion – Violation of N.C.G.S. §14-118.4**

128.    As set forth in ¶86 of this Complaint, the GTN Defendants, through Defendant Leeta Kang, threatened to prevent plaintiffs from leaving by withholding plaintiffs' passports, visas, and return airplane tickets unless they paid two-thousand dollars ($2000.00).

129.    As set forth in ¶87 of this Complaint, when plaintiffs were unable to come up with any further money, the GTN Defendants, through Defendant Leeta Kang threatened to prevent plaintiffs from leaving by withholding plaintiffs' passports, visas, and return airplane tickets unless they signed a waiver of their legal rights against Defendants GTN and Leeta Kang. If they signed the form granting immunity to defendants, she would allow them to have their belongings.

130.    As set forth in ¶88 of this Complaint, plaintiffs refused to sign the form, and, fearing retaliation, left without their belongings out the backdoor of the GTN warehouse.

131.    As set forth in ¶92 above, the GTN Defendants' extortion caused plaintiffs to suffer economic injuries.

**Pattern of Racketeering Activity**

132.    The predicate acts of racketeering activity set forth herein constitute a pattern of racketeering activity as defined by NC RICO, N.C.G.S. §75D-3(b).

133.    The GTN Defendants had filed similar clearance orders with ETA in 2005. These orders contained false statements and sworn assurances, similar to those filed in 2006.

134.    Since 2005, the GTN Defendants have committed multiple acts of racketeering activity, including visa fraud and perjury, with the intent to victimize similarly situated H-2A workers.

135.    The acts of racketeering activity described above are interrelated in the following ways. They had common participants (the GTN Defendants associated with North Carolina growers and overseas labor recruiters including Defendant MBS) and common victims (plaintiffs and similarly situated foreign nationals who hoped to work in the United States). They also each had the same purpose and result of economically benefiting the GTN Defendants at the expense of plaintiffs and other victims.  Finally, they were interrelated in that without racketeering activity, they could not have tricked plaintiffs and other Indonesian nationals out of their property and basic labor rights.

136.    These activities have been a regular part of the GTN Defendants' business activities, and therefore imply a continuing threat of racketeering activity.

## IV.  FIRST CLAIM

### (FLSA)

137.    Plaintiff Sianipar brings this claim under the FLSA, 29 U.S.C. § 216(b), against Defendants Leeta Kang, Simon Kang, GTN, and Bridgman.

138.    The defendants failed to pay the plaintiff the required minimum wage for his work.

139.    As a result, the plaintiff suffered damages.

## V.  SECOND CLAIM

### (Breach of Contract)

140.    This claim is brought by all plaintiffs against Defendants Leeta Kang, Simon Kang, GTN Employment Agency, Inc., Mike Moore d/b/a Mike Moore Farms, Art Bridgman

27

d/b/a Bridgman Vegetable Farms, Irfan Jaya Saputra, and Mutiara Brillian Sejahtera and arises under the common law of contracts.

141. The GTN Defendants offered plaintiffs a written contract for work in the United States, referred to as the "Employment Contract" in this Complaint, attached as Exhibit 5.

142. In addition, by operation of law, Defendants' contract with plaintiffs, as H-2A workers, included all the terms and conditions in the approved clearance order and the regulations, including, referred to in this Complaint as the H-2A Contract, attached as Exhibits 1 and 2.

143. Defendants Moore and Bridgman also formed contracts with Defendant GTN ("The Grower Agreements") to provide work for H-2A workers at their farms, attached as Exhibits 3 and 4. Plaintiffs are the intended beneficiaries of those contracts. The terms and conditions in the H-2A Contracts serve as extrinsic evidence of the additional terms of the Growers' Agreement.

144. Furthermore, Defendants MBS and Irfan Jaya offered plaintiffs a contract in which they promised to provide a job in the United States in return for the payment of 55,000,000 Indonesian rupiah, referred to in this Complaint as the "Fee Contract," attached as Exhibit 6.

145. Defendants violated the H-2A Contract, the Employment Contract, the Growers Agreements, and the Fee Contract and on which plaintiffs had relied in a number of ways. Defendants' broken promises included, among others:

    a.    not paying plaintiffs the adverse effect wage rate of $8.51 per hour for all hours worked;

28

b.      not providing the period of employment promised in the H-2A contract and the Growers' Agreements;

c.      not providing the six (6) months of employment as promised in the Employment Contract;

d.      not providing forty (40) hours of work per week;

e.      not providing plaintiffs with a minimum of three-fourths (¾) of the work days of the total specified period during which the work contract was in effect, as guaranteed by the H-2A Contract;

f.      not providing free housing that was in compliance with OSHA Housing Standards when occupied;

g.      not reimbursing plaintiffs for the cost of transportation, visa, border crossing fees on or before the first pay day as promised in the H-2A Contract;

h.      not providing plaintiffs with "a job" in the United States as promised by the Fee Contract.

146.   In addition, the GTN Defendants and Defendants MBS, and Irfan Jaya violated the oral promises on which plaintiffs had relied in a number of ways. Defendants' broken promises included not providing the period of employment orally promised.

147.   As a result of these breaches, plaintiffs suffered damages.


## VI.  THIRD CLAIM

### (North Carolina Wage and Hour Act)

148. Plaintiffs Sianipar brings this claim under the North Carolina Wage and Hour Act, N.C. Gen. Stat. §95-22(b), against Defendant Bridgman and the GTN Defendants.

149. The defendant intentionally violated plaintiff's rights under the North Carolina Wage and Hour Act by failing to pay promised wages when due in violation of N.C. Gen. Stat. § 95.25.6.

150. As a result, plaintiff suffered damages.

## VII. FOURTH CLAIM FOR RELIEF

### (N.C. RICO)

151. All Plaintiffs bring this claim against the GTN Defendants.

152. Specifically, at all relevant times, the GTN Defendants engaged in "racketeering activity" within the meaning of NC RICO, N.C.G.S. § 75D-3(c) by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. § 1546 (Visa Fraud); N.C.G.S. §14-118.4 (Extortion); N.C.G.S. §14-70 (Larceny), or in the alternative N.C.G.S. §14-90 (Embezzlement); and N.C.G.S. §14-209 (Perjury).

153. The acts of racketeering activity referred to in the previous paragraphs constitute a "pattern of racketeering activity" within the meaning of NC RICO, N.C.G.S. § 75D-3(b). The acts alleged were interrelated by having the common purpose of deriving pecuniary gain from the deprivation of rights of H-2A workers under their employment contract.

154. The acts of racketeering activity described above have been a part of Defendant GTN's regular conduct of business, and, therefore, imply a threat of continued racketeering activity.

155. As a direct, intended and foreseeable result of defendants' violation of NC RICO, N.C.G.S. § 75D-4(a)(1), plaintiffs have suffered an identifiable and distinct injury or damage to their business or property.

30

156. As a result of their misconduct, defendants are liable to plaintiffs for their losses in an amount to be determined at trial.

## VIII.  FIFTH CLAIM FOR RELIEF

### (Unfair and Deceptive Trade Practice)

157. All plaintiffs bring this claim against all defendants.

158.  Defendants engaged in unfair or deceptive acts or practices in or affecting commerce in violation of N.C. Gen. Stat. §75-1.1.

159.  Specifically, defendants breached their contracts with plaintiffs in a manner that included substantial aggravating circumstances and acts of deception, including misrepresenting the amount of work available, the wage rate to be paid, the fact of reimbursement for plaintiffs' travel costs, and the condition of housing for plaintiffs, which caused substantial injury to plaintiffs.

160. As a result, plaintiffs suffered damages.

## IX. SIXTH CLAIM FOR RELIEF

### (Misrepresentation)

161.  All plaintiffs bring this claim under the common law cause of misrepresentation against the GTN Defendants and Defendants MBS and Irfan Jaya.

162. Defendants knowingly made false representations to plaintiffs, orally and in written contracts, beginning as early as mid-2005 and continuing through October 2006 about the terms and conditions of plaintiffs' employment in the United States.  These misrepresentations

31

included, but are not limited to, false statements about the amount of work available, the wage rate to be paid, and the renewal of work visas.

163. Defendants had knowledge of the falsity of their misrepresentations at the time those misrepresentations were made.

164. Defendants intended for Plaintiffs to rely on their false statements and misrepresentations.

165. Plaintiffs justifiably relied on defendants' misrepresentations in deciding to quit their jobs in Indonesia, pay large sums of money to defendants, and leave their families to come to the United States.

166. Defendants' purpose in making these misrepresentations to plaintiffs was to induce them to pay large sums of money to defendants and to come work for defendants in the United States at a wage rate less than the lawful rate for H-2A farmworkers.

167. Plaintiffs were injured as a result of their reliance on defendants' false statements and misrepresentations, which caused them to pay large sums of money to defendants, leave their homes, families, and employment in Indonesia and come to the U.S. where they were not given the promised work, and were housed in cramped, substandard conditions.

168. Plaintiffs suffered damages in an amount to be determined at trial.


## PRAYER FOR RELIEF


WHEREFORE Plaintiff respectfully requests that the Court enter an order:

    (a)    Granting a jury trial on all issues so triable;

    (b)    Declaring that:

Case 3:07-cv-00142-CH    Document 1-1    Filed 03/30/07    Page 33 of 36

i. Defendants Bridgman, GTN, Leeta Kang, and Simon Kang failed to pay Plaintiff Sianipar in accordance with their obligations under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA");

ii. Defendants Bridgman, GTN, Leeta Kang, and Simon Kang failed to pay Plaintiff Sianipar in accordance with their obligations under the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et. seq. ("NC WHA");

iii. Defendants GTN, Leeta Kang, and Simon Kang violated the rights of the plaintiffs under the North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C. Gen. Stat. §§ 75D-1. et. seq. ("NC RICO"); and

iv. each of the defendants violated the rights of each of the plaintiffs under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 ("UDTPA");

(c) Enjoining:

i. Defendants Bridgman, GTN, Leeta Kang and Simon Kang from continuing to violate the NCWHA, N.C.G.S. §§ 95-25.3; and

ii. all the defendants from continuing and/or further violations of; the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 ("UDTPA");

(d) Awarding:

i. Plaintiff Sianipar his unpaid minimum wage and an equal amount as liquidated damages for the violations of his rights under the Fair Labor Standards Act, 29 U.S.C. §201, et. seq. and finding that Defendants

33

Bridgman, GTN, Leeta Kang, and Simon Kang are jointly and severally liable for such amounts;

ii. Plaintiff Sianipar his unpaid wages due under N.C.G.S. §§ 95-25.3 and/or 95-25.6 and/or 95-25.8(2), plus an equal additional amount as liquidated damages under N.C.G.S. §§ 95-25.22(a) and 95-25.22(a1) and finding that Defendants Bridgman, GTN, Leeta Kang and Simon Kang are, jointly and severally liable for such amounts;

iii. all plaintiffs threefold damages under NC RICO, N.C.G.S. § 75D-8(c) from Defendants GTN, Leeta Kang, and Simon Kang jointly and severally;

iv. all plaintiffs treble damages under N.C.G.S. §75-1.1 from all defendants jointly and severally;

v. all plaintiffs damages for breach of their contracts

1. from Defendants GTN, Leeta Kang, and Simon Kang jointly and severally for breach of their H-2A and Employment Contracts ;

2. from Defendants Moore and Bridgman for breach of their Grower Agreements; and

3. from Defendants MBS and Irfan Jaya for breach of the Fee Contracts;

vi. all plaintiffs actual and punitive damages against Defendants MBS, Irfan Jaya, GTN, Leeta Kang, and Simon Kang, jointly and severally, for the misrepresentations made to plaintiffs;

(e)  Awarding plaintiffs the costs of this action;

34

(f)     Awarding plaintiffs prejudgment and post judgment interest at the highest amount authorized by applicable law on any amount of monetary damages awarded as may be appropriate under applicable law; and

(g)     Awarding any other relief as may be just and proper in this action.

Respectfully Submitted,

_____
Mary Lee Hall
N.C. State Bar # 16347

_____
Lori Elmer
N.C. State Bar # 24227

and

_____
Katharine Woomer-Deters
N.C. State Bar # 33892

Legal Aid of North Carolina
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Tel. (919) 856-2180
Fax (919) 856-2187
Attorneys for Plaintiffs

Dated February _____, 2007

35